# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARIAH SMITH,

        Plaintiff,

v.                                           CIV No. 01-416 BB/LFG-ACE

CITY OF ALBUQUERQUE and
ANDREW LEHOCKY, in his
individual capacity as a police officer
with the City of Albuquerque,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## ON DISCOVERY MATTERS

THIS MATTER is before the Court on discovery-related motions filed by Defendant Andrew Lehocky ("Lehocky") and Plaintiff Mariah Smith ("Smith"). Lehocky's motions are as follows: (1) Motion to Compel No. II: Ordering Plaintiff to Answer Deposition Questions Regarding her Physical, Mental, Sexual, and Poly-Substance Abuse and Self Destructive Behavior; (2) Motion to Compel No. III: Ordering Plaintiff to Submit to a Rule 35 Mental Examination; (3) Motion to Compel No. V: Ordering a Witness to Answer Deposition Questions regarding Plaintiff's Physical, Mental & Sexual Abuse & Self Destructive Behavior; and (4) Motion to Compel No. IV: Requiring Plaintiff to Produce all of her Personal Diaries. [Docs. 62, 69, 73, 75.] Smith filed a related Motion for Protective Order. [Doc. 81.] The Court has carefully considered the parties' pleadings and

attachments, along with the pertinent law, in reaching the decisions it sets forth below. Oral argument is not necessary.

## Factual and Procedural Background

On February 2, 2001, Smith filed a Complaint to Recover Personal Injury Damages in state court. On April 13, 2001, the case was removed to federal court based on Smith's claim that Defendants violated her constitutional rights under 42 U.S.C. § 1983. [Doc. 1.] Smith specifically raises claims that her Fourth Amendment rights were violated when excessive and unnecessary force was used during her arrest and detention, along with claims of battery and municipal liability. She seeks compensatory and punitive damages and further alleges, under the battery claim, that she "suffered damages in medical bills, work loss, personal injury and mental and emotional distress." Complaint at ¶ 23. Smith's initial disclosures[1] [doc. 25, ex. B] show that she "makes no calculation of the value[s]" of her pain and suffering, disfigurement or mental and emotional distress, each of which is set out separately.

The underlying allegations drawn from Smith's complaint include that in the early morning hours of February 26, 1999, Smith, who was 16 years old at the time, was at an elementary school in the company of a few friends, including a young man who discharged a firearm. Police were called to the area and discovered that Smith, who was unarmed, was hidden on school grounds in some bushes. Lehocky was present with a police dog, that he unleashed on Smith. The dog chewed on Smith's leg which resulted in personal injuries to her. Complaint at ¶¶ 5-14.

---

[1]These initial disclosures by Smith were supplemented. The supplemental disclosures include a request for "emotional and physical pain and suffering caused by deliberate acts of Officer Lehocky and his actions . . . . The value of these damages is for the jury to decide . . . ." [Doc. 74, Ex. C.]

When Smith subsequently elaborated on the details of the incident to her psychiatrist, she stated that she and three other friends were drinking. She had consumed about five beers when Daniel, one of her friends, "dropped his gun" and it discharged in her friend Tanya's home. A child was asleep in the home, and Tanya became irate demanding that Smith and her friends leave. An argument ensued. Smith and her friends ultimately left the residence but continued arguing until Daniel discharged the weapon a second time, this time in the air.

Smith stated that she, Daniel and another friend Michael ended up at an elementary school park, where some older guys were playing basketball. By this time Michael had the gun. He started walking towards the basketball game, and began shooting the gun in the air. He then ran. Smith was informed by her friend Heather that the police were coming and Smith hid by "[sitting] between two bushes." She did not want the police to find her because she was living with her sister and did not have a legal guardian in New Mexico. She also had two recent citations for shoplifting and underage drinking. It was then that the dog attacked her. [Doc. 68, Ex. A.]

To support her claims of severe emotional injury and post traumatic stress, Smith engaged Dr. Gerald S. Fredman to conduct her psychiatric evaluation and to testify on her behalf. On September 25, 2001, Dr. Fredman conducted a three-hour interview of Smith, and his expert report was produced to Defendants on October 10, 2001. The report documents that Smith discussed with Dr. Fredman a history of physical abuse by her stepmother and father, sexual abuse by her older brother, long-standing mental health issues for Smith and her family, and substance abuse, including the inhalation of solvents, smoking marijuana, drinking alcohol, and periodic use of hallucinogens, amphetamines and cocaine. [Doc. 68, Ex. A.] She also told Dr. Fredman that she engaged in self destructive behavior during her adolescent years and was "very excessive in sex with different

partners." Dr. Feldman concluded, in part, that she was "clearly traumatized by childhood neglect." [Doc. 68, Ex. A.]

Dr. Fredman's report also details Smith's injury on February 26, 1999, and her medical treatment for the dog bite. She was inflicted with "large deep lacerations to the right calf with tissue loss." Her leg was sutured and she underwent multiple skin grafts. Since the injury, she told Dr. Feldman that she gained weight and initially increased her alcohol consumption, but had been abstinent for the last three months. She was not receiving mental health care at that time. She claimed she felt sadness and had flashbacks, some trouble falling asleep, bad dreams and nightmares, although the nightmares predated the dog attack. [Doc. 68, Ex. A.]

Dr. Feldman's testing indicated mild to moderate depression and that she "has many psychological problems at this time." Testing also suggested she was experiencing low morale and a depressed mood. Dr. Feldman stated that the "[t]raumatic event [dog bite] is re-experienced through intense psychological distress at exposure to external cues that resemble an aspect of the traumatic event." Dr. Feldman concluded that she already was experiencing posttraumatic symptoms before the dog bite due to her history of abuse and neglect and that the dog attack "aggravated her psychological state with more serious symptom formation." Her substance abuse-induced disorder and cluster B personality traits also predated the dog attack. "However, the attack by the dog clearly complicates the psychiatric disturbance adding another trauma for Ms. Smith." Dr. Feldman believed the "need for treatment [was] more imperative" since the symptoms had worsened after the attack. Dr. Feldman also recommended random urine toxicology and hepatic function panel to corroborate her report of abstinence from the use of alcohol and drugs. [Doc. 68, Ex. A, pp. 10-12.]

After Defendants received Dr. Feldman's report, they requested an independent medical and psychological evaluation of Smith, under Fed.R.Civ.P. 35. [Doc. 68, Ex. B.] As of December 4, 2001, Smith's counsel agreed to the Rule 35 evaluation. [Doc. 68, Ex. C.] On January 14, 2002, defense counsel informed Smith's attorneys that they had arranged for Smith, who then resided in Pennsylvania, to be examined by a physician in New York on January 21, 2002. [Doc. 68, Ex. D.]

However, in a letter to defense counsel, also dated January 14, 2002, Smith's attorneys stated that they had decided not to call Dr. Fredman, as Dr. Fredman's report discussed many irrelevant issues, and Smith would not assert any claim for "PTSD damages or mental and emotional distress damages that are not the direct result of her bodily injury and disfigurement." [Doc. 68, Ex. 68.] Smith's counsel attached to this letter a proposed jury instruction on compensatory damages, taken from the Eleventh Circuit, that provides, in pertinent part, that the plaintiff, if successful, is entitled to compensatory damages for pain and suffering, mental anguish, and shock and discomfort that she has suffered because of Defendants' conduct. The jury instruction also permits "[a]ny temporary or permanent disfigurement and mental anguish experienced in the past and to be experienced in the future that is the direct result of the disfigurement." [Ex. 68, attachment.]

On January 15, 2002, Smith was deposed. Through repeated instructions, her attorneys did not permit her to answer any questions regarding her prior sexual and physical abuse, drug and substance abuse, and past mental health care. Smith's objections primarily were based on relevancy but her attorneys also explained that as discussed in their previous letter she was dropping the PTSD claim and "psychological conditions." All that remained relevant with respect to damages was "her medical condition, her physical pain and suffering and the emotional aspects of the pain and suffering connected specifically to the injury." [Doc. 68, Ex. G, p. 3.]

Counsel then contacted the Court by telephone during the deposition, for guidance, with respect to counsel's instructions to Smith not to answer certain questions. The Court asked whether Smith initially sought damages for physical, mental and emotional damages and whether she previously claimed she suffered severe emotional distress. [Doc. 70, Ex. H, p. 11.] Smith's counsel agreed this claim had been a part of the lawsuit, but that subsequently, Smith was limiting her claim to "garden variety" emotional distress damages, and that, therefore, no Rule 35 evaluation was justified. Plaintiff's attorney, however, did not concede that Smith was withdrawing all claims for emotional injury. "The only claim that we're bringing is relative to her suffering from the physical injury." [Doc. 70, Ex. H, pp. 11-12.] Essentially, Smith's counsel contended that Smith would seek damages for her emotional harm, but only to the extent that the emotional harm was caused by the injury to her leg. Smith's counsel also stated that their interest was "paramount that this discovery not focus in on plaintiff's background as far as abuse goes. If we have to suffer the exclusion of all mental and emotional distress damages, we may well decide to go that route." [Doc. 68, Ex. G, p. 17.]

After hearing both parties' positions, the Court told counsel that they generally could not instruct a witness not to answer a question in a deposition except for purposes of preserving a privilege or seeking an immediate protective order, or unless the Court previously had limited the scope of examination. The Court expressly cautioned that to proceed by instructing the deponent not to answer the questions, Smith could risk sanctions, including the costs of the deposition or re-deposition and attorneys fees. [Doc. 68, Ex. G, pp. 17-21.] Notwithstanding the Court's admonitions, when the parties resumed the deposition, Smith's counsel stated that he intended to move for a protective order and continued to instruct Smith not to answer any questions about her

history of sexual abuse, substance abuse, and various portions of Dr. Feldman's report. The deposition was not terminated for the purpose of seeking a protective order, nor did Smith move promptly thereafter to seek such an order.

On January 21, 2002, defense counsel wrote to Smith's attorneys asking to be allowed to conduct the requested discovery about Smith's past physical, mental, sexual and substance abuse before filing a motion to compel. On January 26, 2002, Smith's attorneys responded by rejecting the request to "reconsider [Smith's] decision to limit the damages claims . . . to 'garden variety' personal injury jury instructions . . . ." [Doc. 68, Ex. I.]

On March 18, 2002, about two months after her deposition and after Lehocky moved to compel discovery, Smith's counsel filed a motion for protective order raising essentially the same issues contained in Lehocky's motions to compel.

## Discussion

The starting point for discovery disputes is Fed.R.Civ.P. 26(b)(1). Rule 26 generally provides for a broad scope of discovery. A party may obtain discovery regarding any matter, "not privileged, that is relevant to the claim or defense of any party . . . ." Relevant discovery is defined as that information that "appears reasonably calculated to lead to the discovery of admissible evidence." The broad discovery principle under the rules is intended to allow the parties to know as much as they can about each other's claims and defenses prior to trial so as to better evaluate a case for settlement or, alternatively, to be prepared to meet the proofs at the time of trial. Smith v. Ford Motor Co., 626 F.2d 784 (10th Cir. 1980), cert. denied, 450 U.S. 918, 101 S.Ct. 1363 (1981). Moreover, liberal construction is given to the rules to avoid "trial by ambush." Id. at 797. Thus, when a plaintiff seeks substantial damages for a condition, including physical, mental and emotional injury, and places that

condition "at issue," an opposing party may seek discovery on the condition and its causes, as those are relevant to the party's claim or to the defendant's defenses. Fed.R.Civ.P. 26. In contrast, a request for information that has no conceivable bearing on the claims or defenses will usually be disallowed. <u>Miscellaneous Docket Matter #1 v. Miscellaneous Docket Matter #2</u>, 197 F.3d 922, 925-26 (8th Cir. 1999); <u>Garrett v. Sprint PCS</u>, 2002 WL 181364 at *1 (D. Kan. Jan. 31, 2002).

Rule 26 also vests the court with broad discretion to tailor discovery as needed. <u>Crawford-El v. Britton</u>, 523 U.S. 574, 598, 118 S.Ct. 1584, 1597 (1998). The discovery rules provide federal courts with ample discretion to restrict discovery where the burden or expense of the proposed discovery outweighs its likely benefit. <u>Bosaw v. National Treasury Employees' Union</u>, 887 F. Supp. 1199, 1213 (S. D. Ind. 1995). In balancing the need for information against the burden of production or risk of harm, the court considers "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2)(iii).

I.  **Motion to Compel II:  Deposition Questions Regarding Smith's Physical, Mental, Sexual and Substance Abuse, and Self Destructive Behavior**

Lehocky contends that Smith must answer deposition questions about her physical, mental, sexual and substance abuse, and other matters discussed in Dr. Fredman's report because her claim for "mental and emotional distress" damages places these matters at issue. Lehocky specifically argues that he is entitled to investigate whether life stressors, other than the dog attack, may have caused or contributed to the cause of Smith's emotional harm and also may provide evidence to mitigate Smith's claim for damages. Thus, the information is discoverable under Rule 26, as it is relevant to Smith's claims and Lehocky's defenses.

Smith responds[2] that her attorney properly directed her not to answer the questions because such inquiries are no longer relevant after she withdrew her damages claims of severe emotional distress, PTSD, and nightmares of the incident. Smith attempts to explain her revised claims in a number of ways. "[P]laintiff is presenting a garden variety mental and emotional distress damages case related strictly to the physical injury she suffered and to the resulting disfiguration." [Doc. 79, p. 11.] "Plaintiff has no intention of testifying to depression, anxiety or stress. Her testimony will be to shock, horror and the natural self-consciousness that results from the significant scarring. Should the court find these concessions insufficient, plaintiff will drop all claim to mental and emotional distress." [Id.] The damages claimed by Smith are strictly limited to the physical injury she suffered along with the pain and suffering of the physical injury and the mental and emotional distress, or mental anguish, resulting from that injury, but not the dog attack itself.[3] [Id., pp. 8, 12.] Smith also argues that even if marginally relevant, any such relevance is substantially outweighed by risks of unfair prejudice. Fed.R.Evid. 403.

The fact that Smith switched gears after seeing her expert's psychiatric report and now describes her mental distress damages as "garden-variety" does not decide this matter, because Smith's alleged pain and suffering damages do not fit the definition of "garden-variety" damages.

---

[2]Smith provides a single response to Lehocky's two separate motions regarding his request that Smith be ordered to answer deposition questions and that she undergo a Rule 35 mental examination. This was improper. *See* In the Matter of Separate Submission and Docketing of Motions and Responsive Pleadings, No. Misc. 92-88. In the future, Smith should file separate responses to each motion unless permitted to do otherwise by the rules or the Court.

[3]Smith's response to Motions to Compel Nos. II and III contains some strained, if not simply odd, arguments about bridges from one side of the river to the other and deposition testimony by witness Tanya Tijerina. Smith's attorney incorrectly asserts that Lehocky's attorney attached portions of Ms. Tijerina's deposition to his motions and proceeds to devote seven pages of discussion to Ms. Tijerina's testimony when these motions did not mention Ms. Tijerina at all.

"Garden-variety" means ordinary and commonplace. Webster's New World dictionary 65 (3d College ed. 1988). "Garden-variety emotional distress is that which [is] simple or usual. In contrast, emotional distress that is not garden-variety may be complex, such as that resulting in a specific psychiatric disorder, or may be unusual, such as to disable one from working." Ruhlmann v. Ulster County Department of Social Services, 194 F.R.D. 445, 449 n. 6 (N.D.N.Y. 2000); Jessamy v. Ehren, et al., 153 F. Supp. 2d 398, 401 (S.D.N.Y. 2001). *See also* Thiessen v. General Electric Capital Corp., 178 F.R.D. 568, 569 (D. Kan. 1998) (garden variety emotional distress claims are described as an attempt to recover for "generalized insult, hurt feelings and lingering resentment"); Epstein v. Kalvin-Miller Int'l, Inc., 139 F. Supp. 2d 469, 479 (S.D.N.Y. 2001) ("garden variety emotional distress claim is one that did not require medical treatment"); Nolan v. International Brotherhood of Teamsters Health & Welfare and Pension Funds, 199 F. Supp. 272, 276 (N.D. Ill. 2001) (plaintiff did not place her mental condition "in controversy" when she sought damages relating to mere humiliation and embarrassment).

While the Court agrees with Smith that the mere filing of a lawsuit alleging emotional harm does not put her emotional condition at issue, *see* Truong v. Smith, 183 F. Supp. 2d 273, 276 (D.Colo. 1998), Smith has done more than merely allege commonplace or general emotional harm. Similar to the plaintiff in Thiessen, Smith's claim goes beyond a mere "garden variety claim for emotional distress" because she "identified specific injuries which [she] claims were caused, at least in part, by defendants' actions." Thiessen, 178 F.R.D. at 569. She sought and obtained an expert opinion to support her claims. The diagnosis showed a specific, pointed and serious condition. *Cf.* Fox v. Gates, 179 F.R.D. 303, 307-08 (D. Colo. 1988) (finding that asserted emotional distress damages were "garden variety"). Smith's alleged emotional distress damages are not ordinary or

usual; they do not amount to hurt feelings or generalized feelings of insult. Indeed, Smith's counsel concedes that Smith's testimony will include the "shock and horror" relating to the injury, hardly words that describe garden variety hurt or insult. [Doc. 79, p. 11.] Furthermore, she claims mental or emotional distress related to the disfigurement caused by her injuries that resulted from the dog attack. Her physical condition did require medical treatment, and she claims emotional distress damages related to that injury.

Moreover, contrary to Smith's position, it is impossible to draw some clear-line distinction between a request for emotional damages that arise from the physical injury and emotional damages that may have predated the injury but were aggravated by the injury.[4] Clearly, Dr. Feldman found an interrelationship between Smith's symptoms after the incident and stressors before the dog attack. Smith's attempt to distinguish between the two possible types of stressors or damage is unconvincing and unsuccessful. *See* McKenna v. Cruz, 1998 WL 809533 at *2 (S.D.N.Y. Nov. 19, 1998) (the plaintiff offered no convincing explanation for what distinguished garden variety claims from non-garden variety claims). Indeed, Dr. Fredman's report belies the claim that the injuries are "garden variety." The expert report discusses the serious nature of the claimed injuries and the need for extensive therapy. Dr. Feldman diagnosed Smith's emotional distress as pre-existing (aggravated by the dog attack), and ongoing. *See* Gattegno v. Pricewaterhousecoopers, LLP, 204 F.R.D. 228, 232 (D. Conn. 2001) (decided in context of request for Rule 35 mental examination, and concluding that a claim of "ongoing" mental injury also placed the plaintiff's mental state "in controversy"). Thus, Dr. Feldman's diagnosis was made whether or not Smith now wishes to ignore it.

---

[4]At times, even Smith appears to admit this. "Plaintiff concedes that testimony about depression may bolster an argument that other tragic events in her life contributed to the depression." [Doc. 79, p. 9.]

11

Furthermore, the fact that Smith decided not to call Dr. Feldman as an expert or to present expert testimony regarding her emotional distress claim does not protect the requested information from discovery. While it is clear that Smith may elect to establish her alleged damages through lay testimony, the issue "is not how [Smith] intend[s] to prove [her] emotional damages, but, rather, [Defendants'] right to defend against [Smith's] claims. How the Plaintiffs decide to prosecute their claims is a tactical decision for them alone." Sanchez v. U.S. Airways, Inc., 202 F.R.D. 131, 136 n. 7 (E.D.Pa. 2001). *See also* Thiessen, 178 F.R.D. at 571 (Rule 35 examination not precluded merely because of the plaintiff's decision not to present an expert or medical testimony regarding the plaintiff's emotional distress claim); Garrett, 2002 WL 181364 at *2 (fact that the plaintiff did not intend to present expert did not reduce relevancy of requested medical information). In other words, Smith's strategical litigation decisions do not control. Lehocky is free to prepare his defense as he sees fit and explore whether other possible explanations exist for Smith's injuries. He is entitled to explore Smith's claims and to determine their validity.

This case is much like Pugach v. State of New Mexico, et al., Civ No. 99-559 JP/LFG [doc. 41], slip opinion at *2 (D.N.M. Dec. 22, 1999), in which I permitted Defendants to conduct a Rule 35 mental examination of the plaintiff. In Pugach, the plaintiff similarly changed her trial strategy and revised the description of her emotional distress damages to "garden-variety." Like Smith, the plaintiff in Pugach originally designated an expert witness, but then sought to withdraw the designation. Pugach also stated that she was not going to testify that she suffered unusually severe emotional distress and was not offering any expert testimony as to her claims. The Court concluded that the plaintiff's assertion of garden variety damages claim was not consistent with her specific allegations or her medical and psychiatric care.

> Moreover, there would be nothing to prevent her from arguing to the jury the seriousness of her condition or asking the jury to generously compensate her for the humiliation, pain, suffering, emotional trauma and injury which she allegedly suffered. . . . By altering her trial strategy, Pugach now seeks to deny Defendants their right to scrutinize her claims . . . . This would be unfair.

CIV No. 99-559 at *5-6.

Similarly, in this case it would be unfair to preclude Defendants from exploring Smith's prior history of sexual, physical and substance abuse. Information on these matters may well have a significant impact on Smith's present condition. Defendants are permitted to inquire into the existence of certain stress factors that pre-dated the incident at issue, and whether such factors unrelated to this litigation might show that Smith's claims of emotional distress are either "baseless, overblown or insubstantial." Sanchez. 202 F.R.D. at 136. *See also* Thiessen, 178 F.R.D. at 571 (the plaintiff's specific mental condition appeared "inextricably intertwined with the full story which is expected to unfold at trial.") The evidence may show, for example, that Smith's present emotional or psychological condition is attributed to factors and life stressors unrelated to the incidents occurring during the early morning hours of February 26, 1999 or their aftermath. Such evidence is relevant to the claims or defenses in this case, or at a minimum is reasonable calculated to lead to the discovery of admissible evidence. *See* Fox, 179 F.R.D. at 306 (medical records of the plaintiff were relevant to whether the emotional distress the plaintiff claimed to have suffered as a result of the defendant's conduct could be attributed in whole, or in part, to some other stressor in her life.) In addition, I find that the relevance of the requested information is not substantially outweighed by the risks outlined in Fed.R.Evid. 403.

Lehocky will be permitted to re-depose Smith on the areas of inquiry to which her attorneys previously objected. Smith also will be responsible for the costs of the re-deposition, along with the

reasonably attorney's fees incurred in the briefing of this matter.[5]  An award of reasonable fees and costs in this case is justified because the Court expressly advised Smith's attorneys that directions to a client not to answer a deposition question on grounds of relevance was improper except to preserve a privilege, adhere to a prior order limiting the scope of a deposition or to terminate a deposition for purposes of seeking an immediate protective order.  [Doc. 68, Ex. G, pp. 17-21.] <u>Resolution Trust Corp. v. Dabney</u>, 73 F.3d 262, 266 (10th Cir. 1995); <u>American Hangar, Inc. v. Basic Line, Inc.</u>, 105 F.R.D. 173, 174 (D.Mass. 1985).  Despite clear instructions to counsel on this matter, Smith's attorneys continued to improperly instruct their client not to answer questions based on grounds of relevancy and then failed to promptly seek a protective order.  Moreover, if a party intends to seek an "immediate" protective order, it should be done promptly,  not two months after the issue arises in a deposition.[6]  <u>American Hangar</u>, 105 F.R.D. at 174.

## II.    <u>Motion to Compel III: Rule 35 Mental Examination</u>

Lehocky and Smith essentially repeat many of the same related arguments set forth in  the pleadings on Motion to Compel No. II.  In fact, as stated previously, Smith submitted a combined response to the two motions.  Smith argues that she did not assert an intentional infliction claim, never received counseling, and has no intention (now) of testifying to depression, anxiety or stress.  "Her testimony will be to shock, horror and the natural self-consciousness that results from the

---

[5]Smith's argument that defense counsel did not confer in good faith before filing this motion is rejected. Defense counsel invited Smith's attorneys, in writing, to respond to a request to allow them to conduct the requested discovery.  Smith's attorneys expressly rejected that offer.  If Smith's attorneys claim that the matter should have been discussed further in person or by telephone, nothing prevented them from initiating such contact.

[6]The burden of seeking court protection falls squarely the party resisting discovery.  After instructing a deponent not to answer deposition questions, the party refusing to respond cannot then wait until opposing counsel files a motion to compel.  Such a practice is the "exact opposite" of what the Federal Rules of Civil Procedure require.  <u>Fondren v. Republic American Life Insurance Co.</u>, 190 F.R.D. 597, 600 (N.D.Okla. 1999) (*citing* Fed.R.Civ.P. 30(d)); <u>Furniture World, Inc. v. D.A.V. Thrift Stores, Inc.</u>, 168 F.R.D. 61, 63 (D.N.M. 1996) (same).

significant scarring." Therefore, Smith asserts that a Rule 35 examination is not warranted. [Doc. 79, p. 11.]

Rule 35 of the Federal Rules of Civil Procedure state in pertinent part:

> When the mental or physical condition . . . of a party . . ., is in controversy, the court . . . may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . . The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination. . . .

Fed.R.Civ.P. 35(a). When the matter is contested, it is addressed to the sound discretion of the trial court. Meyer v. Lederle Lab., Inc., No. 88-1420-T at 2 (D. Kan. Dec. 27, 1988).

> Thus, Rule 35(a) requires that the party seeking an examination show that the mental or physical condition of the party whose examination is sought is in controversy and that good cause exists for the examination. Schlagenhauf v. Holder, 379 U.S. 104, 111, 85 S.Ct. 234, 238 (1964). However, 'merely conclusory allegations of the pleadings' or 'mere relevance to the case' will not suffice. Rather, the moving party must make 'an affirmative showing that . . . [the] condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering [the] particular examination.' The moving party must 'produce sufficient information, by whatever means, so that the district judge can fulfill his function as mandated by the Rule.'

Hodges v. Keane, 145 F.R.D. 332, 334 (S.D.N.Y. 1993) (internal citations omitted).

A majority of courts, deciding the question of whether to allow a Rule 35(a) examination, recognize that a mental exam is warranted when one or more of the following factors is present:

> (1) a tort claim is asserted for intentional or negligent infliction of emotional distress; (2) an allegation of a specific mental or psychiatric injury or disorder is made; (3) a claim of unusually severe emotional distress is made; (4) plaintiff intends to offer expert testimony in support of claim for emotional distress damages; and/or (5) plaintiff concedes that her mental condition is in controversy within the meaning of Rule 35.

Fox v. Gates Corp., 179 F.R.D. 303, 307 (D. Colo. 1998). Again, a garden variety claim of emotional distress that attempts to recover for nothing more generalized insult, hurt feelings, lingering resentment or embarrassment is not sufficient to justify a Rule 35(a) examination. Thiessen, 178 F.R.D. at 569. But where the plaintiff "asserts more particularized mental or emotional consequences, such as specific injuries that he claimed were caused by defendants' alleged misconduct", a Rule 35(a) evaluation is warranted. Id.

The Court already has concluded that Smith's damages claim seeks more than garden-variety emotional distress damages, regardless of how she now attempts to characterize the claim. In addition, her own expert stated that counseling and treatment were imperative and that, in his opinion, her pre-existing PTSD was aggravated by the dog attack. Thus, according to Dr. Feldman, she suffers from a mental or psychiatric injury or disorder that is not clearly divisible.

In addition, Smith's claims of emotional distress are sufficiently particularized to warrant a Rule 35 evaluation. As stated in Pugach, there is nothing to prevent the plaintiff from arguing to the jury the seriousness of her condition and her extreme emotional distress, even though she presently attempts to narrow the issue to the event in question. Even without expert testimony, Smith can tell the fact finder about her alleged emotional distress. Under these circumstances, the Court believes it appropriate for Lehocky to explore this nebulous dividing line between Smith's alleged emotional distress before and after the incident.

Smith seeks to do what the plaintiff in Hodges v. Keane did. In Hodges, an inmate brought a § 1983 civil rights action. He did not claim that the treatment he received from the defendants resulted in ongoing pain and suffering. Instead, he asserted he suffered pain and suffering at the time his rights were violated. The Court first remarked had he elected to assert a claim for ongoing

emotional damages, the defendants would have undoubtably been entitled to conduct a Rule 35(a) evaluation, but Hodges asserted past instead of present pain and suffering. Upon further review, the Court concluded that a Rule 35(a) evaluation would be permitted where the plaintiff's "mental condition is relevant not only to the extent of his past pain and suffering, but to its cause– i.e., to the very existence of the claimed § 1983 violations." Id. at 335. The same is true here. Although Smith now contends that the only emotional claim she is asserting relates to the trauma, the dog bite and its aftermath, Defendant is simply not required to accept Smith's contention that her emotional injury comes from the dog bite incident.

A plaintiff may not assert a right to damages, and yet deny the opposing party an opportunity to challenge the legitimacy of the claim. Because the Court finds that Smith placed her mental condition at issue and that Lehocky has made a particularized showing of the need to conduct a Rule 35(a) examination, Smith is ordered to submit to an independent examination as arranged for by Lehocky, in accordance with Rule 35, and to undergo drug screen testing in conjunction with the Rule 35 examination.[7]

## III.    Motion to Compel No. V:  Deposition Testimony of Smith's Sister, Kira Smith

On February 8, 2002, Smith's sister, Kira Smith, was deposed. Kira Smith initially attended the deposition without counsel, although Smith's counsel were present. Later in the deposition, Kira Smith's attorney arrived. Before her attorney was present, Kira Smith asked whether she had to answer certain questions regarding her concerns with safety in the Smith family home. In response, Smith's attorneys instructed Kira Smith not to answer certain questions, even though counsel

---

[7]To avoid even more litigation on the Rule 35 examination, the Court notes that there was a dispute on the issue of whether Smith was entitled to have the Rule 35 examination videotaped, audiotaped or to have an "auditor" present. The same requests were recently denied in Vigil v. City of Albuquerque, CIV No. 01-926 [doc. 31] (D.N.M. March 6, 2002).

admitted they did not represent Kira Smith. As noted in the prior discussion concerning Smith's deposition, this instruction was improper. Resolution Trust Corp., 73 F.3d at 266.

After her own attorney appeared, Kira Smith refused to answer questions regarding her sister's sexual abuse, physical abuse, drug abuse and other self destructive behavior. She raised her Fifth Amendment right against self-incrimination in response to questions about her sister's drug use and objected to answering questions about Smith's other abuse on grounds of relevancy and privacy. It is axiomatic that Kira Smith may not assert a Fifth Amendment privilege on Smith's behalf. Kira Smith's attorney remarked that if defense counsel continued with the same line of questioning, she would file a motion for protective order.[8]

Lehocky filed a motion to compel Smith's sister to answer questions about Smith for similar reasons set out in his Motion to Compel No. II. In addition, Lehocky argues that Kira Smith does not have a 14th Amendment right to privacy from having to answer questions about her sister's history of abuse, in part because a right to privacy does not protect criminal activity or information that is readily available to the public. Furthermore, Lehocky contends that both Kira Smith and her sister communicated the requested information to Tanya Tijerina, who testified during her deposition that "nothing is confidential about these girls. . . . With what happens to them, they're open about all of it." [Doc. 76, Ex. D, p. 97.][9]

Kira Smith filed a short response through her attorney. She requests that if the Court permits Lehocky to ask Smith the questions in dispute, Kira Smith should be spared from answering the same

---

[8]Again, it is incumbent upon counsel to file a motion for protective order immediately upon instructing a deponent not to answer questions. Although Kira Smith's attorney alluded to the possibility of filing such a motion, she did not file one.

[9]Lehocky attached a few pages of Ms. Tijerina's deposition to the Motion to Compel No. V.

questions since such discovery would be cumulative or duplicative. Kira Smith further claims that the court should be sensitive to the need for protection of family members of a party.

The Court generally agrees that privacy of family members may be protected under certain circumstances but disagrees that Lehocky should be precluded from exploring relevant information regarding a defense to Smith's claims. Ms. Smith's argument regarding cumulative testimony might have some merit if the Court were considering the admissibility of her testimony at trial. However, the present dispute does not involve admissibility, but only discovery, and the Court is not constrained at this stage with concerns about admissibility. The question is whether her testimony is relevant to the parties' claims and defenses and/or reasonably likely to lead to admissible evidence. Fed.R.Civ.P. 26. Here, the Court concludes that the information sought is relevant, not privileged and discoverable. Moreover, the fact that Smith is a "more convenient source" for this type of information is not necessarily true or established at this point. Lehocky is entitled to test Smith's testimony on these issues against testimony from other individuals who are likely to have discoverable information in support of a party's claims or defenses.

Thus, the Court will grant Lehocky's motion to compel and permit him to re-depose Kira Smith regarding the questions in dispute that she previously refused to answer. To the extent that any questions could expose Kira Smith *personally* to criminal liability, she of course may invoke her Fifth Amendment right. However, invocation of a privilege where none exists, could subject Kira Smith to sanctions. Objections to the questions based on grounds of relevancy and/or privacy concerns will not be permitted. Resolution Trust Corp., 73 F.3d at 266.

In addition, Kira Smith and/or her attorney will be assessed sanctions in the form of the costs of the re-deposition and attorneys' fees in briefing Motion to Compel No. V. Kira Smith's argument

that the court has no authority under Rule 37 to sanction a non-party for discovery abuses is without merit. Rule 37 provides that if a motion to compel is granted, "the court shall, after affording an opportunity to be heard, require the *party or deponent* whose conduct necessitated the motion *or the party or attorney* advising such conduct or both of them to pay . . . the reasonable expenses incurred in making the motion . . . unless the court finds . . . [the] nondisclosure . . . was substantially justified . . . ." Fed.R.Civ.P. 37(a)(4)(A) (emphasis added); <u>Athridge v. Aetna Casualty and Surety Co.</u>, 184 F.R.D. 200, 208 (D.D.C. 1998).

In this case, the Court finds that Kira Smith's objections during her deposition and refusal to answer certain questions were improper and unjustified. So, too, the instructions to her not to answer were improper. With few exceptions, instructions not to answer a question based on grounds of relevancy are improper. Furthermore, a motion for protective order must be filed immediately upon instructing a deponent not to answer deposition questions. <u>Resolution Trust Corp.</u>, 73 F.3d 262. While Kira Smith's attorney threatened to file a motion for protective order she did not terminate the deposition and file the appropriate motion. Instead, her attorney permitted the deposition to continue while instructing Kira Smith not to answer the questions in dispute, and no protective order was filed on her behalf. Under the circumstances, an award of fees and costs is appropriate.

## IV.    <u>Motion to Compel No. IV:  Smith's Personal Diaries</u>

Lehocky requests that Smith be ordered to produce her complete, unedited, and unredacted personal diaries, or alternatively, that she provide them to the Court for an *in camera* review. Smith testified at her deposition that she kept personal journals or diaries going back about nine years, that she had a journal in February 1999 at the time of the dog attack, and that she was "pretty sure" she

made entries in her journal about the incident and her feelings about it.[10] [Doc. 74, Ex. A, pp. 78-79.] Smith testified that she did not want to produce her journals primarily due to privacy concerns. However, she did not disclose the diaries, nor did she provide a privilege log as required by D.N.M. LR-Civ 26.3(e).

In <u>Gill v. Beaver</u>, 1999 WL 461821 at * 1-2 (E.D.La. July 2, 1999), the plaintiff brought a lawsuit against defendants relating to an automobile accident that caused injuries to her. In response to a document request, the plaintiff identified a daily journal she kept since the 1970's. She refused to produce it, however, and properly filed a motion for protective order. She argued that the majority of the diary contained personal matters that were not relevant, that it would cause her undue embarrassment to produce it, that she already had testified about the pertinent matters in her deposition and that she had a constitutional right to withhold it based on privacy concerns.

Similar to Lehocky, the defendants in <u>Gill</u> asserted that the diaries contained relevant discoverable material, that the plaintiff had not asserted any privilege and that she had waived her right to privacy by way of making certain allegations in the lawsuit. The defendants also argued that the diaries were contemporaneous records that could contain impeachment evidence.

The <u>Gill</u> Court ordered production of redacted portions of the diaries under the protection of a confidentiality order. The Court reasoned that other courts, faced with the same issue, had "routinely ordered the production of personal diaries" in response to document requests. <u>Id.</u> at *1 (internal citations omitted). The Court found that production was justified where the plaintiff made allegations that were related to information contained in her personal diary. The Court explained that

---

[10]Notwithstanding her testimony about her journals, Plaintiff did not describe her personal journals as part of her Initial Disclosures and did not disclose the journals in response to a document request that called for statements of this type. This was improper.

the diaries might contain irrelevant personal information, but they also might include a description of the plaintiff's complaints of pain. In addition, they could present contradictory evidence to which the defendants were entitled.

This Court agrees with the reasoning set out by the Court in Gill. Here, Smith did not assert any type of privilege, did not provide a Vaughn Index or privilege log, and concedes that the diaries contain information about the incident in question.[11] Clearly, such information is relevant to the claims and defenses in the case and constitutes a contemporaneous record of the event. The Court will order Smith to produce the unredacted, original diaries for an *in camera* review, but for the more limited period of January 1999 through the present date. Plaintiff should provide the diaries to the Court within ten days of the filing date of this Order. The Court declines to enter sanctions against Smith for failure to produce or identify the journals earlier in this litigation.

## V.    Plaintiff's Motion for Protective Order

After Lehocky filed these four motions to compel, Plaintiff filed a Motion for Protective Order essentially covering the same issues and arguments contained in the briefing of the motions to compel. Thus, the Court denies Plaintiff's Motion for Protective Order as moot.

IT IS THEREFORE ORDERED THAT:

(1)    Lehocky's Motion to Compel No. II [doc. 67] is granted.

(a)    Smith is ordered to appear at her re-deposition in Albuquerque and respond to the questions in dispute as described by the Motion and this Order.

---

[11]A "Vaughn Index" is a term derived from Vaughn v. Rosen, 484 F.2d 820 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). It generally consists of a listing of the documents withheld, identifies the individual who created the document and the persons to whom the document was distributed, and includes the dates of the documents. It also identifies the specific privilege claimed.

(b)     Discovery is extended to the extent necessary for the parties to agree on a mutually convenient date for Smith's re-deposition.

(c)     Lehocky is awarded the costs of Smith's re-deposition and his reasonable attorney's fees incurred in bringing Motion to Compel No. II.

(d)     Lehocky's counsel should submit to the Court an affidavit setting forth the reasonable attorney's fees within ten days of the entry of this Order.

(2)     Lehocky's Motion to Compel No. III [doc. 69] is granted in part and denied in part.

(a)     Smith is ordered to appear at a Rule 35 mental examination and fully cooperate with Dr. Michael Welner;

(b)     Smith is ordered to undergo drug screen testing in conjunction with the Rule 35 examination.

(c)     Discovery deadlines are extended for purposes of submitting the pertinent expert witness reports and for Smith to take Dr. Welner's deposition, if required.

(d)     Lehocky's request for costs and attorney's fees related to Motion to Compel No. III is denied.

(3)     Lehocky's Motion to Compel No. V [doc. 75] is granted.

(a)     Kira Smith is ordered to appear at the continuation of her deposition and to respond to the questions in dispute as described in the Motion and this Order.

(b)     The discovery deadline is extended for purposes of continuing Kira Smith's deposition.

(c)     Kira Smith is directed to pay the costs of the continued portion of the deposition and the reasonable attorney's fees incurred in bringing Motion to Compel No. V.

(d)     Lehocky's counsel should submit to the Court an affidavit setting forth the reasonable attorney's fees within ten days of the entry of this Order.

(4)     Lehocky's Motion to Compel No. IV [doc. 73] is granted in part and denied in part.

(a)     Smith is ordered to produce the unredacted original diaries, from January 1, 1999 to the present, to the Court for an *in camera* review, with ten days of the filing date of this Order.

(b)     Lehocky's request for attorney's fees and costs is denied.

(5)     Plaintiff's Motion for Protective Order [Doc. 81] is denied as moot by the above-explained rulings.


_____

Lorenzo F. Garcia
United States Magistrate Judge