**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MARIAH SMITH,

        Plaintiff,

v.                                                                      No. CIV 01-416 BB/LFG

CITY OF ALBUQUERQUE and ANDREW
LEHOCKY, in his individual capacity as a
police officer with the City of Albuquerque,

        Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court for consideration of a number of motions filed by Defendants: (1) Defendant Lehocky's motion for separate trials (Doc. 96); (2) two motions for partial summary judgment filed by Lehocky (Docs. 98, 104); and (3) three motions for partial summary judgment filed by Defendant City of Albuquerque (Docs. 106, 108, 110). The Court has reviewed the submissions of the parties and the relevant law, and, for the reasons set forth below, finds that the motion for a separate trial will be granted, and the motions for summary judgment will be denied.[1]

---

[1] The Court takes this opportunity to disapprove of the motions practice of both Defendants in this case. Each Defendant has split what should be one motion for summary judgment into multiple motions for partial summary judgment. While this practice was probably employed to allow the attorney to forego the difficult task of succinct analysis, this procedure is burdensome on the opposing party and on this Court. In the future, each party represented by defense counsel will be limited to one motion for partial or full summary judgment, rather than a separate motion for partial summary judgment for each claim a plaintiff may have raised.

This case arises out of an incident in which Plaintiff Mariah[2] Smith was bitten by a police service dog ("PSD") which Defendant Lehocky had set loose in order to find Plaintiff. When she was bitten Plaintiff was hiding from the police, at night, on the grounds of an elementary school. She suffered injuries to her leg and hand. Unfortunately, her injuries became infected and she will allegedly have to pay $50,000 for medical expenses alone as a result of the PSD's bites. Plaintiff maintains Lehocky's actions constituted excessive force violating the Fourth Amendment. Plaintiff has also raised claims of municipal liability against the City, contending the City's policies concerning the use of PSDs are unconstitutional and helped cause the injuries she suffered in this case.

**Motion for Separate Trials:** Defendant Lehocky asks the Court to bifurcate the trials in this case, holding his individual-liability trial first and then the municipal-liability trial against the City. He argues that bifurcating the trials will avoid unfair prejudice to him and, if he is not found liable, could eliminate the need for addressing the municipal-liability question. Plaintiff opposes the request for bifurcation. Judges in this district have consistently granted requests for bifurcation, where the litigation of one issue might obviate the need for litigation on another issue. In fact, this Court recently issued an opinion and order granting a motion for separate trials in an excessive-force case. *See Lomeli v. City of Albuquerque*, No. CIV 01-443 (memo. opn. dated September 18, 2002). As noted in that opinion, courts often bifurcate underlying civil-rights claims from the municipal-liability claims brought against municipal employers. *See, e.g., Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999). This case presents the same considerations as those relied on by other courts to bifurcate proceedings. First, if Defendant Lehocky is not found liable for a constitutional violation, there will be no need to hold the municipal-liability portion of the trial against the City.

---

[2]It is not clear to the Court whether Plaintiff's first name is spelled Moriah or Mariah. Both spellings appear frequently in the pleadings. In the later pleadings, the Mariah spelling appears to predominate, and the Court therefore uses that spelling in this opinion.

Second, in order to support her municipal-liability claim, Plaintiff plans to present evidence that may not be relevant to the case against Lehocky, and may well be prejudicial. For example, she plans to introduce evidence of prior injuries caused by Albuquerque PSDs, other dog-bite cases in which the dogs failed to "guard and bark" but instead bit the suspect, and of the City's failure to conduct meaningful reviews in this case and other dog-bite cases. Pltf. Resp. to Mot. for Sep. Trials, pp. 2-3. While it is possible that some of this evidence, if it involves other dog-bite cases in which Lehocky and Bart (the PSD in this case) were involved, may be relevant and admissible against Lehocky for certain purposes, it is apparent that much of the other evidence Plaintiff plans to rely on would not be admissible against Lehocky. The Court is therefore not persuaded by Plaintiff's opposition to the request for separate trials. The underlying excessive-force claim against Defendant Lehocky will be tried first. If the jury finds Lehocky liable for a constitutional violation, the same jury will remain empaneled to hear the municipal-liability claim against the City.

**Motions for Partial Summary Judgment--Standard:** "Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.,*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." *Walker v. NationsBank of*

*Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995). The Court will consider the summary-judgment motions in light of these standards.

**Defendant Lehocky's Motions for Partial Summary Judgment:** Lehocky has filed two motions for partial summary judgment, arguing first that he is entitled to qualified immunity on the issue of whether use of a police dog should be considered "deadly force," and second that he is entitled to qualified immunity on the excessive-force claim in its entirety.

**Deadly Force Motion:** The Court will deny the first motion, as it is premature. Even if the Court ruled in favor of Lehocky on the deadly-force question, Lehocky would not be entitled to immunity from suit or from liability. Deadly force is simply one form of excessive force, and the jury could find Lehocky used excessive force even if releasing a PSD is not considered deadly force. Granting Lehocky's first motion for partial summary judgment would mean granting him qualified immunity from only one theory advanced by Plaintiff in support of her excessive-force claim; the claim itself would still remain. This motion appears calculated to pre-judge an appropriate jury instruction, and is not a productive use of the qualified-immunity framework.[3]

---

[3] In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court held that the Fourth Amendment applies where a police officer has used deadly force during a seizure. Subsequently, the Supreme Court expanded the *Garner* principle and decided that the Fourth Amendment should apply to all excessive-force cases arising out of the seizure of a free citizen, not just seizures in which deadly force was used. *Graham v. Connor*, 490 U.S. 386, 396 (1989). It is not apparent to this Court that there is a significant difference between the *Graham* standard for the use of force and the *Garner* standard for the use of deadly force. For example, the *Garner* "test" specifically mentions the giving of a warning, if feasible, before deadly force may be used. However, dog-bite cases involving police dogs routinely consider the question of whether a warning was given, even when the *Graham* standard is being applied. *See, e.g., Vathekan v. Prince George's County*, 154 F.3d 173, 178-79 (4th Cir. 1998); *see also Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001) (warnings should be given where feasible if use of force may result in serious injury, even if force used is not deadly force; lack of warning is factor to be considered in applying *Graham* balancing test). The ultimate question under both standards with respect to the warning question is whether it was reasonable, given the level of force the officer planned to employ and the surrounding circumstances, to fail or refuse to issue a warning prior to the application of force.

At this stage, then, a decision on the deadly force issue will not shorten the trial or eliminate any claims brought against Lehocky. There is therefore no need to make a decision at this time, prior to hearing the evidence presented at trial. The motion will be denied without prejudice to the renewal of the argument at trial.

**Excessive Force Motion:** Lehocky contends that, even under the facts viewed in the light most favorable to Plaintiff, releasing Bart to find and bite Plaintiff was objectively reasonable. At his deposition he testified that he heard on the police radio before he arrived on the scene, and was told after he arrived, that two suspects, a male and female, were hiding somewhere on the grounds of John Baker Elementary School. He also testified repeatedly that he was told both suspects were armed, and that he knew one of the suspects had discharged a firearm at innocent civilians. (Lehocky depo. pp. 39, 45, 48, 51-52, Exh. A, Lehocky MPSJ II). If these facts were undisputed, Lehocky would have a much stronger argument that the decision to set Bart loose to find the suspects was reasonable as a matter of law.

The above facts, however, are not undisputed. Plaintiff has submitted evidence tending to show that Lehocky's deposition testimony was incorrect as to what he was told, or otherwise knew, when he arrived on the scene. There is evidence from the City's police radio logs that the only armed

---

Despite the similarity between the two standards, a number of courts (especially in the Ninth Circuit) have expended a great deal of effort attempting to decide whether the *Garner* standard, rather than the *Graham* standard, should apply to particular dog bite cases. *See, e.g., Vera Cruz v. City of Escondido*, 139 F.3d 659 (9th Cir. 1997); *Quintanilla v. City of Downey*, 84 F.3d 353 (9th Cir. 1996); *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994). In the Court's view, this inquiry (if necessary at all) is properly deferred to the jury instruction stage, when the jury will be given the standards to apply to the conduct of Officer Lehocky and PSD Bart. This will allow the presiding judge to consider evidence regarding Bart's training, his propensity to bite suspects, and the extent of injuries normally caused by such bites. *Cf. Quintanilla* (deadly force issue raised in context of challenge to jury instructions); *Vera Cruz* (use of *properly trained* police dog is not deadly force, as a matter of law).

subject was a male with a shaved head; that no radio transmission ever mentioned the possibility that the female was armed; that the armed male may have been in a *residential* area, not the school; and that the only suspect seen running on the school grounds was the female. (Exh. A, Pltf. Resp. to Lehocky MPSJ II). Furthermore, Officer Johnson was the officer who provided information to Lehocky when Lehocky arrived with Bart. Officer Johnson's police report indicates that Johnson interviewed one of the victims of the aggravated assault, who informed him that the "male subject" was armed with a gun and shot it when the victims ran from the park. The report also indicates that a "female named Mariah Smith" had been with the offender, and was possibly still on the grounds of John Baker Elementary School. (Exh. B, Lehocky MPSJ II). There is, therefore, a clear issue of fact as to whether Lehocky knew or should have known that the only suspect hiding on the school grounds was the unarmed female who had been present at the shooting incident.[4] This fact question is directly relevant to the prong of the *Graham* test which requires an analysis of whether the suspect poses an immediate threat to the safety of the officers or others.

There are also genuine issues of fact concerning other factors that have been considered significant in dog-bite cases. One such factor is whether the police dog that bit the suspect was properly trained. *See* Maria A. Audero, Note, *From Man's Best Friend to Deadly Force?: Vera Cruz v. City of Escondido*, 29 Sw. U. L. Rev. 139, 157-62 (1999) (reviewing dog-bite case law). A dog trained to guard and bark, rather than find and bite, is obviously less likely to cause injuries to the suspect. For that reason, the decision to release a guard-and-bark dog is more apt to be reasonable, especially against an unarmed suspect. In this case, Defendant Lehocky testified that Bart was trained to guard and bark. (Lehocky dep. pp. 21, 99, Exh. A, Lehocky MPSJ). However, it

---

[4]It should be noted that Officer Johnson is apparently now unavailable to provide information about what he told Lehocky on the night in question, as he is on military duty at an unkown location overseas.

6

appears undisputed that Bart did not bark before biting Plaintiff; instead, Bart found Plaintiff hiding in bushes and immediately bit her leg, even though Plaintiff was allegedly completely still. (Pltf. dep. p. 187, Exh. D, *id.*; Lehocky dep. pp. 113-16, Exh. A, *id.*). Furthermore, Plaintiff has submitted a number of dog-bite reports involving Bart and other suspects. In none of these incidents is there an indication that Bart found the suspect and then barked; instead, in all of them, Bart found the suspect and immediately bit him or her. (Appendix A, Pltf. Resp. to City MPSJ 1). Accordingly, there is an issue of fact as to Bart's training and as to whether Lehocky knew or should have known that, once he deployed Bart, it was virtually certain Bart would bite the suspect when he found her.[5]

Another factor considered significant in dog-bite cases is whether a warning has been given before the dog is released to find the suspect. *See* Audero, *supra*; *Vathekan, supra; cf. Deorle, supra* (non-dog-bite excessive force case). Giving a warning allows a suspect to avoid being bitten by a PSD, by surrendering to the officers. In this case, Lehocky stated in his deposition that he did not issue any warning prior to deploying Bart, because he did not want to endanger officers or the public in the residential areas near the school, who might come out of their houses to find out what was going on. (Lehocky dep. pp. 110-11, Exh. A, *supra*). However, he also stated that he did not give any warnings because "the people on that school grounds on that particular night did not want to give up. They fled in the first place. Once they were spotlighted, they fled a second time to conceal themselves... Warnings were not issued to the offenders because of their effort to flee and conceal and because of their actions." (*id.* pp. 57-58) A reasonable inference can be drawn that Lehocky

---

[5]Defendant Lehocky did submit an affidavit in which he stated that his ratio of deployments to bites was only 1.57%--that is, in over 98% of the instances in which Lehocky deployed a PSD, no bite occurred. The more relevant ratio, however, as to which no information was provided, is the ratio of deployments in which a PSD actually found a suspect without biting the suspect, and the deployments in which a suspect was found and bitten by a PSD. That ratio, rather than a ratio that includes an undetermined number of deployments in which no suspect was even located, would shed more light on the propensity of Lehocky's PSDs to bite suspects rather than guard and bark.

refused to provide a warning, not because of safety concerns, but simply because Plaintiff was trying to hide from the officers instead of giving herself up. In addition, there is evidence that in other situations also involving possibly armed suspects and possible curious residents nearby, Lehocky did give warnings before releasing Bart. (Exh. I, Pltf. Resp. to Lehocky MPSJ II). This also raises a question of fact regarding Lehocky's explanation for his failure to give a warning in this case.

In sum, there are questions of fact as to whether Lehocky knew, when he released Bart, that a bite was almost certain to result. There are also fact issues as to whether that level of force was reasonable, given the possibility that Lehocky knew it was likely the unarmed female was the only suspect on the school grounds at the time. *See, e.g., Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000). Finally, there are questions of fact about whether a warning should have been given to allow Plaintiff an opportunity to surrender and avoid an encounter with Bart. Summary judgment is therefore not appropriate, either on the merits of the claim or on Lehocky's request for qualified immunity. For the same reasons, summary judgment will not be granted on Plaintiff's state-law battery claim.

**City's Motions for Summary Judgment:** As noted above, the City has split Plaintiff's municipal-liability claim into three separate issues and filed a separate motion for partial summary judgment addressed to each issue, despite the fact that they overlap to a large extent. These issues are the existence of a municipal custom or policy allowing, or causing, excessive force in incidents involving PSDs; the City's failure to train Officer Lehocky; and the issue of supervisory liability. The Court will address the motions together.

Plaintiff's main arguments concerning the municipal-liability question are as follows: (1) the City's written policy concerning use of PSDs is unconstitutional on its face because it allows the use of a PSD to detain (by biting) any fleeing felon, regardless of the nature of the felony and regardless

of whether the fleeing suspect poses a danger of harm to officers or the public; (2) the City's policy categorizes the use of a dog as less force than a baton; (3) the City has a custom of ignoring its dogs' repeated failures to guard and bark, rather than bite, passive suspects; and (4) the City's written policy fails to require a warning before a PSD is deployed on an area search, although a warning is required before a building is searched by a PSD and its handler. (Pltf. Resp. to City MPSJ 1).

To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir.1993). The Court finds that Plaintiff has raised a genuine issue of material fact as to whether the City has employed improper policies or customs with respect to the use of PSDs, and as to whether those policies or customs helped cause Defendant Lehocky to use excessive force in this case. For one thing, although the standard operating procedures ("SOP") regarding use of PSDs do initially recite the *Graham* factors, they authorize the use of dogs to apprehend any person suspected of any felony, if the person is fleeing. (Albuq. Field Services Bureau SOP 6-3, par. 2, unmarked Exh. C, Pltf. Resp. to City MPSJ 1). Thus, under the City's written policy, a person suspected of even a non-violent offense such as felony shop-lifting, without any evidence the suspect might be dangerous to officers or others, could be attacked and bitten by a PSD. This blanket authorization ignores the *Graham* requirement that both the severity of the crime and the threat posed by the suspect must be considered when an officer decides to use force, especially force (such as a dog bite) that can cause serious injuries. As noted above, there is evidence in this case that Lehocky may have deployed Bart to find Plaintiff simply because Plaintiff was fleeing the police, and because he thought she had been involved in some way in a felony. Lehocky's act falls within the authorization granted under the

9

City's SOP, and therefore there is an issue of fact as to whether the SOP caused or contributed to Lehocky's deployment decision.

As Plaintiff points out, the City's SOP may also cause dog handlers to be willing to deploy PSDs in situations where such action would not be constitutional, because the SOP describes the use of a dog as a level of force less than the use of a baton. (*Id.*) Therefore, officers would be led to believe they can use PSDs in situations where they would not be allowed to employ a baton. There is evidence in this case, however, that the hospitalization rate for suspects hit with a baton (approximately 6%) is much lower than the hospitalization rate for those subjected to a PSD apprehension (between 25 and 50%). (Bogardus Decl., p. 5, Exh. D, Lehocky MPSJ I).[6] If this evidence is accurate, the City should not be encouraging officers to consider PSD use a lower level of force than using a baton. In this case there is evidence that Lehocky was aware of the City's comparison between batons and PSDs; he specifically pointed to this SOP as justification for his actions, at his deposition. (Lehocky dep. p. 59-60, Exh. A, Lehocky MPSJ II). There is therefore a question of fact as to whether he was more willing to use Bart to apprehend Plaintiff, because of his awareness of how the City viewed PSD use in the use-of-force continuum.

With respect to the warning question, Plaintiff has raised an issue of fact as to whether the City's policy was constitutionally adequate, or in the alternative had a practice or custom of ignoring violations of its SOP for area searches. According to the SOP, warnings must be given prior to deploying a PSD in any building search. (SOP 6-3-3(A)). No similar requirement exists for non-building searches, which may be because the SOP appears to require that area searches be conducted with the PSD on a leash. (SOP 6-3-3(B)). A leashed PSD is much less likely to bite a suspect than

---

[6]This evidence correlates with common sense; while blows with a baton seem likely to cause bruises, a dog bite is very likely to cause wounds that bleed profusely, present a risk of infection, and require more treatment than a bruise normally would.

an unleashed PSD, so a warning is not needed to allow an opportunity to avoid the bite. If leashing the PSD during an area search was indeed a requirement, however, there is a fact question as to whether it was ever enforced. In none of the area-search dog bite reports submitted by Plaintiff does it appear that the PSD was kept on a leash. (Appx. A and B, Pltf. Resp. to City's motions). Furthermore, there is no indication in the materials submitted to the Court that any officer was ever reprimanded or told to follow the SOP for leashed area searches in the future. It could therefore reasonably be said that the City was deliberately indifferent to its dog handlers' regular practice of ignoring the SOP regarding area searches. *See Harris*, 489 U.S. at 389 (if the plaintiff asserts the alleged custom or policy comprised a failure to act, he or she must demonstrate the municipality's inaction resulted from "deliberate indifference to the rights" of the plaintiff).

Alternatively, if the City's policy regarding area searches was different than SOP 6-3-3(B), so that PSDs were not required to be leashed, it still appears that the City had no policy for area searches requiring warnings where feasible and appropriate. Lehocky was aware that the City's SOP required warnings for building searches but not for area searches, and relied on that difference at his deposition to justify his failure to give a warning in this case. (Lehocky dep. p. 162-63, unmarked Exh. D, Pltf. Resp. to City MPSJ 1). This, again, raises an issue of fact as to whether the City's policies and customs contributed to his decision not to issue warnings prior to deploying Bart in this case.

Plaintiff's final argument is that the City customarily ignored the failure of its PSDs to guard and bark, rather than immediately bite, passive suspects. As pointed out above, Plaintiff has submitted numerous examples of incidents in which suspects in minor crimes were immediately bitten by PSDs, including Bart, which found the suspects hiding. (Appx. A and B). If the number of incidents of this type is small compared to the number of times PSDs found suspects and actually did

11

guard and bark, the City could not as likely be said to be deliberately indifferent to the problem. At this point, however, the only information before the Court is Plaintiff's examples of bite incidents, and the bite ratio evidence provided by Lehocky. Again, this bite ratio evidence is not dispositive because it does not include a breakdown of the number of deployments that resulted in no suspect at all being found. In the absence of evidence showing that guard-and-bark incidents are far more common than find-and-bite incidents, the Court finds there is an issue of fact as to whether the City was deliberately indifferent to the habits of its PSDs (or their handlers) to engage in find-and-bite practices rather than guard-and-bark.[7]

In sum, there are questions of fact as to whether the City's policies and customs encouraged the use of PSDs in situations where such use would constitute excessive force. *See Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991). There are also questions of fact as to whether these policies and customs caused or helped cause the deployment of Bart in this case. Since the Court has already held that the deployment of Bart and Bart's subsequent attack on Plaintiff presents a jury question on the excessive force issue, the City's motions for partial summary judgment will be denied.

**Conclusion:** Pursuant to the foregoing opinion, Defendant Lehocky's motion for separate trials will be granted, and Defendants' various motions for partial summary judgment will be denied.

---

[7]The Court does not mean to suggest that find-and-bite techniques are unconstitutional as a matter of law. In certain circumstances, particularly those involving suspects armed with firearms who would be likely to shoot a barking PSD, an immediate disabling bite might be more appropriate. However, allowing PSDs or handlers to consistently employ the find-and-bite technique, even against unarmed non-violent suspects, would certainly raise questions of reasonableness in the constitutional context. Since there is a question of fact in this case as to whether Lehocky knew or should have known he was deploying Bart against an unarmed suspect who offered little threat to the officers, there is a question of fact as to whether the City's alleged custom of condoning find-and-bite practices helped cause Lehocky's decision.

## ORDER

A Memorandum Opinion having been entered this date, it is hereby ORDERED that Defendant Lehocky's motion for separate trials (Doc. 96) be, and hereby is, GRANTED; and Defendants' motions for partial summary judgment (Docs. 98, 104, 106, 108, and 110) be, and hereby are, DENIED.

Dated this 7th day of October, 2002.

BRUCE D. BLACK
United States District Judge

**ATTORNEYS**:
**For Plaintiff**:
Joseph P. Kennedy
Brad D. Hall

**For Defendant City of Albuquerque**:
Kathryn Levy

**For Defendant Andrew Lehocky:**
Luis Robles